## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| DEREK I. ALLMON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:17-cv-01906-TWP-DML |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW
### AND RULING FOLLOWING BENCH TRIAL

This matter is before the Court following a bench trial on Plaintiff Derek Allmon's ("Mr. Allmon") Federal Tort Claims Act suit against the United States of America, alleging that two correctional officers used excessive force against him on August 12, 2016, while he was incarcerated at the Federal Correctional Institution in Terre Haute, Indiana ("FCI Terre Haute"). The bench trial was held on August 31 and September 1, 2020, in Terre Haute, Indiana. Mr. Allmon was present in person and by counsel.[1] The United States of America was present by counsel. Federal Rule of Civil Procedure 52(a) directs the Court to separately set out its findings of fact and conclusions of law in an opinion or a memorandum of decision. To the extent that any findings of fact are more properly construed as conclusions of law, or vice versa, they should be construed as such.

### I. FINDINGS OF FACT

Based on the testimony at trial and the exhibits admitted into evidence, the Court has determined that the following facts are true.

---

[1] The Court greatly appreciates the quality representation that volunteer counsel, Darren Craig and Carly Tebelman of the law firm of Frost Brown Todd, provided to Mr. Allmon.

Mr. Allmon is a 56-year old African American male currently serving a life sentence within the Federal Bureau of Prisons ("BOP"). John Parker ("Lt. Parker") has worked for the BOP for over nineteen years and was a lieutenant at FCI Terre Haute in August 2016. Darla Ramey ("Lt. Ramey") has worked for the BOP for over twenty-two years and was also a lieutenant at FCI Terre Haute in August 2016. Both Lieutenants Parker and Ramey received BOP training on the use of force which instructed them to use the minimum amount of force necessary in all situations. Mr. Allmon alleges three distinct incidents of excessive force. The first time Mr. Allmon interacted with either lieutenants was on August 12, 2016.

## A.     **The First Incident**

On August 12, 2016, Mr. Allmon was housed in the Special Housing Unit ("SHU") of the Communications Management Unit at FCI Terre Haute. That unit houses inmates who require close monitoring of their communications. Mr. Allmon was placed in the SHU following an altercation with another inmate on August 11, 2016. Because the other inmate was Caucasian and was not placed in the SHU after the altercation, Mr. Allmon believed the decision to place him in the SHU was motivated by race. He asked to speak to Captain Rigsby about the situation but was denied. He then flooded his cell with water from his sink in an attempt to get Captain Rigsby's attention.

When that did not work, Mr. Allmon attempted to get Captain Rigsby's attention by simulating a suicide attempt. Mr. Allmon tied a blanket around his cell door, made a loop, and placed it around his neck. He had no intention of actually committing suicide, and his feet remained on the floor and he did not place his full weight on the looped blanket. Nurse Norris observed Mr. Allmon's behavior and she summoned Officer Joshua Emerson ("Officer Emerson") and other officers, who responded immediately. Nurse Karl Norris ("Nurse Norris") evaluated Mr.

2

Allmon and he was transferred to Union Hospital where he spent the night of August 11, 2016. While at the hospital, Mr. Allmon began a hunger strike. Hospital records indicate that Mr. Allmon said that he would not eat or drink or take his medications if he was returned to FCI Terre Haute. Hunger strikes were not new to Mr. Allmon, and it was documented that he had previously engaged in hunger strikes. An administrative note completed by Dr. Elizabeth Trueblood ("Dr. Trueblood") documenting Mr. Allmon's return to FCI Terre Haute states that Mr. Allmon "was threatening a hunger strike so we will watch." [Trial Exhibit 1.] (Dkt. 149 at 197.)

Mr. Allmon was returned to FCI Terre Haute's Communications Management Unit SHU on the morning of August 12, 2016. After refusing to talk to a BOP psychologist, Mr. Allmon was stripped of his clothes and placed in SHU Cell 10, a cell that was dirty, lacked water service, and was hot. Cell 10 is approximately 6 feet wide and 7-8 feet long. Although Mr. Allmon was the only inmate in the SHU at that time, staff refused his requests to be placed in a different cell.

Senior Officer Cody Miller ("Officer Miller") worked in the Communications Management Unit SHU on August 12, 2016. As required when working on this unit, he conducted rounds approximately every forty minutes. To prevent Officer Miller from observing him, Mr. Allmon, "being ornery," placed wet toilet paper over the metal mesh window into his cell. (Dkt. 149 at 24-25.) Covering one's window is against prison policy and presents a safety concern, particularly when an inmate is at risk of self-harm. When Officer Miller discovered the covered window, he ordered Mr. Allmon to remove the toilet paper. Mr. Allmon refused and told Officer Miller to step back from the door, because he was going to urinate on the floor. (Dkt. 149 at 25-26.) Mr. Allmon then urinated on the floor.

When Mr. Allmon refused Officer Miller's second order to remove the toilet paper, Officer Miller contacted the Lieutenant's Office to report that Mr. Allmon had covered his cell window.

3

On that day, Lt. Parker was the highest-ranking lieutenant at FCI Terre Haute from approximately 3:00 p.m. to 11:00 p.m. Lt. Ramey had been informed by a secretary that Mr. Allmon had been sent to the hospital after attempting suicide the day before. Both Lt. Parker and Lt. Ramey responded to Officer Miller's call. BOP staff are trained to take all indications of suicide seriously and are aware that inmates in the SHU are often at a higher risk of suicide.

Officers Rodney Vincent ("Officer Vincent"), Ryan McCammon ("Officer McCammon"), Officer Miller, and Officer Emerson also responded to the response. The officers stood outside SHU Cell 10 while Lt. Parker banged on the door, identified himself, and ordered Mr. Allmon to uncover his window. Mr. Allmon refused to uncover his window and instead stated "FU" to Lt. Parker. (Dkt. 149 at 91.) Lt. Ramey picked at the wet toilet paper with her fingernail in an attempt to remove it from obscuring their view into the cell. She observed some red on the paper and thought it could be blood. Believing that Mr. Allmon had attempted suicide the day before, she assumed Mr. Allmon had attempted to harm himself and she feared for his safety. Lt. Parker continued to order Mr. Allmon to uncover the window. Mr. Allmon then stopped responding, which was concerning to Lt. Parker. (Dkt. 149 at 203-205.)

The frenzied nature of the following encounters can be heard on the video. However, available video evidence does not show what transpired in Mr. Allmon's cell. The following facts are based on the Court's credibility determinations of the various witnesses' testimonies. Lt. Parker ordered Officer Miller to open the cell door and within approximately five seconds, all six responding BOP personnel rushed into Cell 10. As Lt. Parker entered the cell, Mr. Allmon pushed him in the chest.[2] Staff are authorized to apply physical restraints necessary to gain control of an

---

[2] Mr. Allmon testified that preemptively, he began to lay down on the cell bed to deescalate any interaction with BOP members about to enter the cell, and he was passively lying face-down in his bunk when officers entered his cell. The Court must disregard with Mr. Allmon's testimony that directly contradicts the decision of the BOP disciplinary hearing officer who found Mr. Allmon guilty of assaulting Lt. Parker. (Tr. Exhibit 209.)

inmate who appears to be dangerous when an inmate becomes violent or displays imminent signs of violence, so Lt. Parker began to use force in order to restrain Mr. Allmon. (Dkt. 150 at 9:6-14.)

Officer Vincent and Lt. Ramey were the second and third officers to enter the cell and saw Mr. Allmon at the door, and it appeared that Mr. Allmon was attempting to stop Lt. Parker from entering. Officer McCammon, Officer Miller, and Officer Emerson, in that order, then entered the cell. Lt. Parker used force to get Mr. Allmon on the bottom bunk of the bed. This included jumping on Mr. Allmon's back and Mr. Allmon felt strikes to his face and head. Lt. Parker placed Mr. Allmon face-up on the bunk and then forcibly turned him over. Mr. Allmon moved his face into the bed mattress to protect his face. (Tr. 30:12-18, 96:9-10.) Lt. Parker and Officer Vincent also applied force to place Mr. Allmon on the bottom bunk.

When Lt. Ramey entered, she observed Mr. Allmon in a sitting position on the bunk. While on the bunk, Mr. Allmon resisted being placed in restraints, yelled, and tried to kick the officers. Lt. Parker kneed Mr. Allmon attempting to restrain him. Lt. Ramey yelled "stop kicking" several times and placed her arm over Mr. Allmon's legs in a blocking position to keep him from kicking at staff. (Tr 221:23-222:12-15) (Tr. Exh. 3). During the struggle, Lt. Parker pushed Mr. Allmon back to the bottom bunk.

Officer Miller entered the cell last and saw Mr. Allmon lying face down on the bottom bunk. Officer McCammon got control of Mr. Allmon's left arm so that Lt. Parker and Officer Vincent could apply hand restraints. Due to Mr. Allmon's combative behavior, Lt. Parker made the decision to place Mr. Allmon in ambulatory restraints—which include handcuffs, a black box, a "martin" chain around the waist, and leg restraints—until Mr. Allmon exhibited a pattern of

compliant behavior. Lt. Parker received approval for the continued use of ambulatory restraints from his supervisor, Captain Rigsby, who in turn had received approval from the Acting Warden.

Officer Emerson and Officer Wayne Newman applied the ambulatory restraints. Special Investigative Service Lieutenant Randall Mosley arrived after on the scene after the other officers had entered Mr. Allmon's cell. He supervised the application of ambulatory restraints to Mr. Allmon. Once restrained, officers moved Mr. Allmon to Cell 12 where he was evaluated by Nurse Sarah Walters ("Nurse Walters"). Mr. Allmon was cooperative while being moved to Cell 12. During his evaluation, Mr. Allmon complained of pain in his head, jaw, and ankles and reported that staff had kicked and hit him. Nurse Walters examined Mr. Allmon and did not note any injuries such as abrasions, cuts, or bruising.

### B.     The Second Incident

BOP policy requires that a lieutenant conduct a restraint check every two hours when an inmate is in ambulatory restraints. Cell 12 was very hot, and Mr. Allmon lost consciousness. At approximately 5:35 p.m. on August 12, 2020, Lt. Parker conducted a restraint check on Mr. Allmon. Officers Cox and McCammon and Nurse Norris were also present. When the officers entered Cell 12, Mr. Allmon was lying unresponsive on the floor and the "martin" chain was no longer around his waist. Nurse Norris performed a sternal rub which is a painful rubbing of the knuckles on the ribs of the patient to awaken him. Mr. Allmon responded. (Dkt. 149 at 102.) He asked Lt. Parker to assist him up from the floor. Lt. Parker refused to help him get up and Mr. Allmon heard Lt. Parker respond using a racial derogatory term toward him. (149 Tr. 42:25-43:6). Officer McCammon, Officer Cox and Nurse Norris, who were all present in the cell, did not hear Lt. Parker make any racially derogatory remarks. Nurse Norris assisted Mr. Allmon to the bottom bunk in a sitting position and began to take Mr. Allmon's blood pressure.

Lt. Parker can be heard on the video yelling "stop grabbing my leg." (Tr. 105:2-21.) Mr. Allmon alleges that Lt. Parker kicked him in the head and that kick resulted in a knot developing on his head. (Tr. 44:2-4.) Lt. Parker denies that he kicked Mr. Allmon. Officers Cox and McCammon, and Nurse Norris did not see Lt. Parker kick, knee, hit, or otherwise assault Mr. Allmon during this restraint check. Video evidence shows that Lt. Parker was never alone with Mr. Allmon during this restraint check. Although the camera's view is partially blocked by Nurse Norris or other officers at certain points of the video, there is no indication on the video that Lt. Parker kicked, kneed, or hit Mr. Allmon. At points in the video, Mr. Allmon can be heard yelling, even while Lt. Parker is not physically near him.

Nurse Norris assessed Mr. Allmon and did not note any injuries. Officers McCammon and Cox again placed the "martin" chain around Mr. Allmon's waist. Because Mr. Allmon had not yet shown a pattern of compliant behavior, Lt. Parker determined that Mr. Allmon should remain in ambulatory restraints.

Lt. Ramey conducted a restraint check at approximately 7:35 p.m. Mr. Allmon can be heard on video yelling statements such as "kill the nigger" throughout the check. (Dkt. 149 at 115.) Lt. Parker conducted another restraint check at approximately 9:40 p.m. Nurse Norris assessed Mr. Allmon again and noted that there was no trauma to Mr. Allmon's mouth or head. Nurse Norris also noted that Mr. Allmon was alert, oriented, and that his pupils were equal, round, and reactive, indicating that he did not have a head injury. Mr. Allmon was given cups of water to drink and Lt. Parker ordered Officer Cox to bring a mattress into the cell for the night. Lt. Parker again decided to continue the use of ambulatory restraints because Mr. Allmon had not yet shown a pattern of compliant behavior.

C. **The Third Incident**

Lt. Parker conducted his last restraint check of the night at approximately 10:34 p.m. Officers Vincent and Cox were also present. Mr. Allmon requested water. Video evidence shows Lt. Parker momentarily leave view of the camera and return with a cup in his hand before the cell door is opened. The officers enter the cell and remain inside for approximately one minute. Because he did not see from where Lt. Parker brought the cup of water, Mr. Allmon refused to drink the water. Mr. Allmon either spit the water out or Lt. Parker threw it in his face. Mr. Allmon testified that Lt. Parker then punched him in the chest; however, Officer Vincent and Lt. Parker testified that Lt. Parker did not assault Mr. Allmon during this restraint check. Lt. Parker again determined that Mr. Allmon should remain in the ambulatory restraints.

After the end of Lt. Parker's shift, three other lieutenants performed seven additional restraint checks and determined that Mr. Allmon should remain in ambulatory restraints due to his lack of compliant behavior.

At approximately 12:45 a.m. on August 13, 2016, Emergency Medical Technician Ryan Drummy ("EMT Drummy") conducted a restraint check of Mr. Allmon and concluded that the restraints were "a slight bit tight," meaning that EMT Drummy could not fit his finger under the restraints. EMT Drummy did not note any injuries from the restraints. Mr. Allmon complained of head pain and stated that he believed he had a concussion. EMT Drummy noted that Mr. Allmon did not have any motor or neurological deficits, that his speech was clear and concise, and that he moved his extremities well, indicating that he had not suffered any injury.

EMT Drummy again checked Mr. Allmon's restraints approximately two hours later. Mr. Allmon again complained that he had a concussion from hitting his head on the floor the day before. EMT Drummy again assessed Mr. Allmon and did not note any abrasions, lacerations,

8

redness, swelling, or hematomas. EMT Drummy determined that Mr. Allmon's restraints were neither too loose nor too tight. The Court finds EMT Drummy's testimony and medical records prepared at the time of the incident to be credible.

At approximately 7:55 a.m. on August 13, 2020, Nurse Kelly Keller checked Mr. Allmon's restraints. Nurse Keller did not note any injuries. Mr. Allmon complained of a headache so Nurse Keller checked his pupils and confirmed that they were equal and reactive to light. Nurse Keller assessed Mr. Allmon approximately three hours later and did not note any injuries. The Court finds Nurse Keller's testimony and medical records prepared at the time of the incident to be credible.

A behavior management plan was prepared consistent with BOP policy at approximately noon on August 13, 2016. The plan was not prepared by Lieutenants Parker or Ramey. The plan involved continued ambulatory restraints for Mr. Allmon due to his lack of self-control and disruptive behavior. Mr. Allmon's ambulatory restraints were removed a few hours later at 2:30 p.m. on August 13, 2016.

Nurse Walters evaluated Mr. Allmon on the evening of August 14, 2016, and did not note any injuries. On August 15, 16, and 17, 2016, Mr. Allmon was evaluated by BOP nursing staff several times and there is no indication in the records that Mr. Allmon had any injuries or was in distress. On August 19, 2016, Dr. Trueblood assessed Mr. Allmon. He complained of a headache and sinus congestion. He reported his headache was due to being kicked. Dr. Trueblood ordered a CT scan.

On the evening of August 21, 2016, Nurse Walters evaluated Mr. Allmon. He complained of a headache and reported that he was kneed in the head ten days prior. Nurse Walters did not note any evidence of an injury or signs of concussion.

9

Mr. Allmon was transferred to the United States Penitentiary in Marion, Illinois, on August 26, 2016. Shortly after his arrival, he received a medical evaluation and reported that he had been kicked in the head on August 12, 2016. Mr. Allmon continued to complain of head pain on August 30, 2016. The medical provider ordered a CT scan which was performed on September 30, 2016. The result of the scan was negative.

At the time of his trial, Mr. Allmon had a knot on his head which he attributed to the events in August 2016. Mr. Allmon never sought psychological treatment as a result of the incident on August 12, 2016. Mr. Allmon has been experiencing pain since the assaults on August 12, 2016 and has continually complained of pain since that date. He has not been diagnosed with any permanent disability as a result of the incident nor has he paid any medical bills or lost any wages as a result.

## II. CONCLUSIONS OF LAW

The Federal Tort Claims Act provides that the United States is liable for money damages for personal injury caused by the negligent or wrongful act or omission of any employee of the United States while acting within the scope of his or her employment if a private person would be liable to the claimant under the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b)(1). Under Indiana law, "[i]f an officer uses unnecessary or excessive force, the officer may commit the torts of assault and battery." *Wilson v. Isaacs*, 929 N.E. 2d 200, 203 (Ind. 2010). A person commits the civil tort of assault and battery in Indiana if "(a) he acts intending to cause a harmful or offensive contact with the person of the other or third person, or an imminent apprehension of such contact, and (b) a harmful contact with the person of the other directly or indirectly results." *Singh v. Lyday,* 889 N.E.2d 342, 360 (Ind. Ct. App. 2008) (quoting *Mullins v. Parkview Hospital, Inc.,* 865 N.E.2d 608, 610 (Ind. 2007)). Because battery is an intentional tort,

the defendant is only liable if he acted recklessly or with reckless disregard of the consequences. *Turner v. Sheriff of Marion Cnty.*, 94 F. Supp. 2d 966, 994 (S.D. Ind. 2000).

"A law enforcement officer is justified in using reasonable force if the officer reasonably believes that the force is necessary to effect a lawful arrest." Ind. Code Ann. § 35-41-3-3 (West). If an officer uses unnecessary force his conduct is no longer privileged, and he is answerable for assault and battery. *City of S. Bend v. Fleming*, 397 N.E.2d 1075, 1077 (Ind. Ct. App. 1979). The law enforcement provision applies to all law enforcement officers, including employees of the Bureau of Prisons. *Millbrook v. United States*, 569 U.S. 50, 52 (2013).

Unfortunately, the video evidence presented at trial does not depict what occurred within the cell and the Court was required to determine the credibility of each witness testimony. Some factors the Court considered in determining the credibility of the witnesses were the demeanor, and candor of the witness while testifying, the inherent plausibility of the witness's account, the consistencies and inconsistencies between the witness's present and prior statements, and whether the witness had bias, prejudice or other reason to lie or slant the testimony. The Court concludes based on the evidence presented at trial that it is more likely than not that the force used by Lieutenants Ramey and Parker was reasonable and not excessive.

Although Mr. Allmon's suicidal gesture on August 11, 2016 was motivated by his desire to send a message to Captain Risgby, rather than to harm himself, prison staff acted reasonably when they entered his cell the following day after Mr. Allmon covered his cell window and stopped responding to commands. Lt. Ramey might have been able to pick away enough toilet paper to see into the cell and avoid having to enter it. And another officer might have been able to use a broom to brush away the toilet paper to see into the cell. But when Lt. Ramey observed a red substance on the paper, it was reasonable for the officers to conclude that they needed to enter the

11

cell immediately rather than take the time to pick at the paper or even to brush it away with a nearby broom.

When Lt. Parker entered the cell, Mr. Allmon was at the door and pushed Lt. Parker. These facts were established by the findings of the disciplinary hearing officer when Mr. Allmon was charged with assaulting Lt. Parker and those findings (while not dispositive) cannot be disregarded in this litigation. *See Gilbert v. Cook*, 512 F.3d 901 (7th Cir. 2008) (prisoner claiming excessive force cannot contradict disciplinary board's finding that he punched the guard involved in the incident) (citing *Heck v. Humphrey*, 512 U.S. 477 (1994)). Furthermore, the disciplinary records reveal that during his disciplinary hearing, Mr. Allmon denied that he resisted staff and stated that "he didn't do anything", but he did not report to have been lying passively on his bunk when staff entered his cell. (Tr. Exh. 204.)

Regarding the first incident, the Court credits the testimonies of Lt. Parker, Lt. Ramey, and the other officers present regarding the force they applied to Mr. Allmon in his cell. Although the officers present disagree about whether Mr. Allmon was first placed on the bed in a sitting position, lying face-up, or lying face-down, the Court does not find these inconsistencies to be dispositive of the witnesses' credibility or of the question of whether Lieutenants Parker and Ramey applied excessive force.

The force used to restrain Mr. Allmon was reasonable and was not intended to harm him. When Lt. Parker jumped on his back, it was to force Mr. Allmon onto the bunk so that he could be restrained. To the extent that Mr. Allmon felt kicks to his body and hits to his head and face, those strikes occurred during scuffle when Mr. Allmon was kicking and struggling with the officers. To the extent Lt. Parker put his weight or knee on Mr. Allmon's body, such force was reasonable and necessary to overcome Mr. Allmon's resistance and to apply restraints.

Nurse Walters' assessment of Mr. Allmon immediately after the initial use of force found no signs of visible injury. And medical records from his numerous follow-up medical assessments also fail to support Mr. Allmon's allegations that he was beaten during the initial use of force. The Court finds Nurse Walters' testimony and medical records prepared at the time of the incident to be credible.

Regarding the second incident, the Court credits the testimonies of Lt. Parker, Officers Cox and McCammon, and Nurse Norris that Lt. Parker did not kick or otherwise assault Mr. Allmon during this restraint check. Video evidence of the 5:35 p.m. restraint check does not support Mr. Allmon's allegations. Although it is difficult to see the interactions between Mr. Allmon and Lt. Parker in portions of the video, no excessive force is depicted. Officers McCammon and Cox and Nurse Norris were also present for this restraint check and did not observe Lt. Parker using excessive force. The Court credits their testimonies and that of Lt. Parker that he did not kick Mr. Allmon in the head or assault him in any way during this restraint check.

Once Mr. Allmon's restraints were secured, Nurse Norris performed a check and noted no injuries. Although Mr. Allmon had a visible knot on his head at trial—four years following the incident—and testified that the knot developed after Lt. Parker kicked or kneed him in the head during the 5:35 p.m. restraint check, none of the medical records note any knot on Mr. Allmon's head following this encounter. The Court finds Nurse Norris' testimony and medical records prepared at the time of the incident to be credible.

Regarding the third incident, Mr. Allmon has not met his burden of showing more likely than not, that excessive force was used against him. Mr. Allmon testified that Lt. Parker threw water in his face and punched him in the chest during the 10:34 p.m. restraint check. He testified that Officers Emerson and McCammon were present for this restraint check, but the video evidence

demonstrates that they were not. Instead, the video shows that the restraint check was witnessed by Officers Vincent and Cox and lasted approximately one minute. Whether Lt. Parker threw water in Mr. Allmon's face out of frustration with Mr. Allmon's onerous behaviors, or Mr. Allmon spit the water out, is not relevant because that act does not result in excessive force. Although parts of the encounter are not visible on the video, the Court credits the testimonies of Lt. Parker and Officers Vincent and Cox that Lt. Parker did not punch Mr. Allmon in the chest, or assault him in any way during this restraint check. Again, the medical records do not show any injury from this encounter.

Having accepted as true that there was no physical manifestation of physical injury observed by medical staff after any of Mr. Allmon's encounters with Lieutenants Parker and Ramey, the Court concludes that no excessive force was used.

Although it was revealed at trial that during one restraint check, EMT Drummy concluded that Mr. Allmon's wrist restraints were "a slight bit tight," the Court notes that Mr. Allmon's complaint raised no claims regarding restraints that were too tight or any injury from such restraints. Furthermore, the record reveals that prison policy ensured that Mr. Allmon's restraints were frequently assessed and loosened when they were found to be even slightly tight.

Finally, the Court notes Mr. Allmon's testimony that he believes Lt. Parker's and Lt. Ramey's actions against him on August 12, 2016 were motivated by racism. In particular, Mr. Allmon testified:

> And to really, really be honest with you, Your Honor, I feel that Lieutenant Parker -- now this is my own opinion. This is nothing nobody said. This is coming straight out of my mouth. I feel that Lieutenant Parker and Lieutenant Ramey, they brutalized me because I am a black man.
>
> They brutalized me, number two, because I am a prisoner. Your Honor, they brutalized me because there is a major problem of systemic racism in the Federal Bureau of Prisons.

(Dkt. 149 at 49:17-25.)

Despite this belief, Mr. Allmon testified at trial that Lt. Ramey had never said anything racist to him, (Dkt. 149 at 66). And, although he testified at trial that Lt. Parker used a racial slur during the first restraint check, Mr. Allmon previously testified under oath at his deposition that Lt. Parker had never said anything racist to him.

> QUESTION: Have you ever -- had you -- did you ever hear him [Lt. Parker] -- did he ever say anything racist to you?
>
> ANSWER: No. It was the way that he and I had talked to each other through -- back and forth through that door that day.

(Dkt. 149 at 65.) Moreover, the video evidence does not support Mr. Allmon's trial testimony – no racist comments from either Lt. Parker or Lt. Ramey are heard on the video. The Court does not credit Mr. Allmon's trial testimony on this point but instead credits the testimonies of Lt. Parker and the other BOP employees that they have not heard Lt. Parker use racial slurs or make racists comments at work. (*See* Dkt. 153 at 31 ¶8.) While systemic racism may exist in the BOP, there is no evidence in the record – apart from Mr. Allmon's belief – that Lieutenants Parker and Ramey acted with racial animus regarding the events on August 12, 2016.

Mr. Allmon has failed to establish by a preponderance of the evidence that the force used by either Lt. Parker or Lt. Ramey on August 12, 2016 was excessive force. The Court need not consider the issue of damages. Judgment consistent with this Order and the Order Granting Motion for Partial Summary Judgment, dated May 2, 2019, (Dkt [62]) (granting partial summary judgment to the United States on Mr. Allmon's claims of negligent hiring, training, supervision, and retention), shall now issue.

**SO ORDERED.**

Date: 11/24/2020

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

15

DISTRIBUTION:

Derek I. Allmon, 12579-076
SPRINGFIELD MEDICAL CENTER/FEDERAL PRISONERS
Inmate Mail/Parcels
P.O. BOX 4000
Springfield, Missouri  65801

Darren Andrew Craig
HEWITT LAW & MEDIATION, LLC
dcraig@hewittlm.com

Gina M. Shields
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
gina.shields@usdoj.gov

Julian Clifford Wierenga
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
julian.wierenga@usdoj.gov

Carly Jolene Tebelman
FROST BROWN TODD
ctebelman@fbtlaw.com